## McNABB et al. v. UNITED STATES.
### No. 9663.

Circuit Court of Appeals, Sixth Circuit.

June 2, 1944.

E. B. Baker, of Chattanooga, Tenn. (E. B. Baker and Wilkes T. Thrasher, both of Chattanooga, Tenn., on the brief), for appellants.

O. T. Ault, of Chattanooga, Tenn. (James B. Frazier and O. T. Ault, both of Chattanooga, Tenn., on the brief), for appellee.

Before HICKS, SIMONS, and McALLISTER, Circuit Judges.

HICKS, Circuit Judge.

This is the second appearance of this case here. On the first appeal we sustained convictions of murder in the second degree. McNabb et al. v. United States, 6 Cir., 123 F.2d 848, 849. The Supreme Court reversed

---

on the ground that confessions, upon which the convictions rested, were obtained by persistent questioning of the accused while they were in the custody of arresting officers and before any order of commitment had been made. McNabb et al. v. United States, 318 U.S. 332, 345, 63 S.Ct. 608, 87 L.Ed. 819.

The Supreme Court said:

"Congress has explicitly commanded that 'It shall be the duty of the marshal, his deputy, or other officer, who may arrest a person charged with any crime or offense, to take the defendant before the nearest United States commissioner or the nearest judicial officer having jurisdiction under existing laws for a hearing, commitment, or taking bail for trial * * *.' 18 U.S.C. § 595, 18 U.S.C.A. § 595. * * * The purpose of this * * * requirement of criminal procedure is plain. * * * Legislation such as this, requiring that police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the 'third degree' * * *. It aims to avoid all the evil implications of secret interrogation of persons accused of crime." [318 U.S. 332, 63 S.Ct. 613, 87 L.Ed. 819.]

The court denied a petition to rehear and said that on a retrial it would "be open to all parties to adduce all evidence relevant to the admissibility of the confessions, whether adduced in the previous trial or not." 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727.

It is conceded that the facts on the present appeal are substantially the same as in the first case and since the facts were fully stated both in our previous opinion and in the opinion of the Supreme Court, they will not be restated in detail.

The new evidence relates primarily to the arraignment of appellants before, and their commitment by, a United States commissioner. There was also corroborative testimony tending to link Benjamin McNabb with the firing of the fatal shot. At the second trial appellants were convicted of voluntary manslaughter and sentenced to imprisonment for nine years and three months.

Samuel Leeper, an Investigator of the Federal Alcohol Tax Unit, was fatally shot on the night of July 31, 1940, while emptying two cans of whiskey in a family cemetery near the McNabb settlement and after he and other Investigators had interrupted the loading of an automobile with untaxed liquor. Freeman and Raymond McNabb were arrested at their home around one or two o'clock on the morning of August 1st and Benjamin surrendered himself at the offices of the Alcohol Tax Unit in the Federal Building at Chattanooga around 8 or 9 o'clock on the morning of August 2nd.

Freeman and Raymond were questioned on the night of August 1st and all three appellants were together and separately questioned at the Federal Building by Alcohol Tax Unit Agents at intervals during August 2nd and into the early morning of August 3rd. There was evidence by appellants that they, in the course of these questionings, were cursed and threatened and called liars. These matters were particularly narrated in both former opinions.

In the opinion of the Supreme Court, it was categorically stated that none of the appellants was taken before the United States Commissioner before the questioning took place [318 U.S., supra, pages 334, 337, 63 S.Ct. pages 610, 611, 87 L.Ed. 819] and as indicated, this failure, coupled with the examination by the officers, was deemed such a flagrant disregard of statutory procedure as to require reversal.

On the question whether appellants were legally detained at the time of the questionings, the Government introduced evidence upon the second trial that Freeman and Raymond McNabb, as well as two other members of the McNabb family who were acquitted on the first trial, were brought before the Commissioner in Chattanooga on the morning of August 1st on charges of having violated provisions of the Internal Revenue Code; that they pleaded "not guilty" and in default of bail were committed to jail; that on the next morning, August 2nd, the appellants, including Benjamin McNabb, who surrendered that morning, were brought before the Commissioner on a warrant charging them with the murder of Leeper; that they pleaded "guilty" and were committed to jail without bond and preliminary hearing was postponed to August 8th.

These facts were proven by the testimony of J. H. Anderson, the Commissioner. He

testified that his records showed that on the morning of August 1st a complaint was sworn out by J. D. Jones, Inspector of the Alcohol Tax Unit, charging Barney, Raymond, Freeman and Emuil McNabb with violating several sections of the Internal Revenue Code, and that his recollection was that these defendants were arraigned in the office of the Alcohol Tax Unit in the basement of "this building" (the Federal Building) and that bond was fixed at $500, following which they were committed to jail. He remembered "distinctly that it came up that morning because it was the morning following the killing in this case."

He further testified that another warrant was sworn out on August 2nd by R. S. Abrams of the Alcohol Tax Unit against Raymond, Barney, Emuil and Benjamin (sic) charging them with the murder of Leeper but later in his testimony he stated that the names of all five appeared on the warrant and affidavit that he signed. This was evidently so, since appellants make no point of the omission of Freeman's name in the first part of Anderson's testimony. It was Anderson's recollection that they were arraigned in the office of the Alcohol Tax Unit in the basement of the Federal Building at about 9 or 10 o'clock on the morning of August 2nd.

Referring to his records, Anderson testified: "They were arraigned that morning and the preliminary hearing was set for August 8th and they were committed to jail without bond, until the hearing of August 8th." He stated that his records showed that a mittimus was issued both on the first and second days of August. He further testified (the jury having retired) that when the defendants were arraigned on the liquor case they pleaded "not guilty" and "On August 2nd after the complaint and warrant was read to them they pleaded guilty to the murder case." The Government did not rely upon this plea of "Guilty" as evidence of guilt and the Judge excluded it from the record, although he construed the plea as a waiver of a preliminary hearing. On this phase of the case the following took place out of the presence of the jury:

"Q. 39. (Dist. Atty. Frazier) On August 2nd, 1940, when the defendants were arraigned before you as United States Commissioner, and charged with the murder of Mr. Leeper, were they advised of their constitutional rights? A. I don't remember doing any thing except read the complaint and warrant to the defendants and ask them for their pleas. I don't think I gave them any warning as to their constitutional rights.

\*        \*        \*        \*        \*

"Q. 40. \* \* \* At that time they did enter a plea in the murder case, before you? A. Yes, sir; after reading the complaint and warrant, that is, stating the substance of it, I asked them for their plea.

"Q. 41. Each and every one entered a plea of guilty at that time? A. Yes, sir.

"Q. 42. Did you hear any proof? A. No, I postponed the case until the 8th of August. On the 8th of August, at the preliminary trial, the record does not show and I don't remember whether they said or what they said as to guilty (sic) or innocence. \* \* \*"

J. G. Jones, Agent of the Alcohol Tax Unit, testified that the complaint for violation of the Revenue Laws was sworn out on the morning of August 1st before Commissioner Anderson at the office of the Alcohol Tax Unit. He was under the impression that when the complaint was sworn out, Emuil, Raymond and Freeman were in the custody of the Marshal in the Federal detention room. On cross examination he testified that he did not actually see the arraignment, but that Commissioner Anderson and the defendants were there and he took it that they were arraigned.

Coyle Ricketts, a Deputy Marshal, testified that he received a warrant for Benjamin (sic), Barney, Freeman and Emuil McNabb in the liquor case about 10:30 or 11 o'clock on the morning of August 1st and that arraignment took place on August 1st. He also testified that he served the complaint in the murder case in the neighborhood of 9 o'clock on the morning of August 2nd and that Benjamin McNabb was present at the time.

The District Attorney testified that to the best of his recollection the complaint in the murder case against Benjamin, Freeman and Raymond was issued on the morning of August 2nd, although he did not remember the hour. He recalled that at the first trial he heard Abrams testify that he took out the complaint in the murder case on the afternoon of August 2nd. Abrams himself testified that he took out the complaint in the murder case on August 2nd and that he thought this was early in the afternoon. On the other hand, Rex Kitts, of the Alcohol Tax Unit, testified positively that all five defendants were arraigned in the mur-

der case between 8 and 9 o'clock on the morning of August 2nd. He testified that Commissioner Anderson read the complaint to them and that the arraignment lasted a "very few minutes."

Several of the agents candidly stated that they did not see Anderson around the offices on August 2nd and did not witness any arraignment.

On the other hand, there is a suspicious sameness in the language used by the three appellants in their testimony that August 8th was the first time they saw Commissioner Anderson.

Whether appellants were taken before the Commissioner on August 1st and 2nd were questions of fact which were submitted to the jury and were determined in the affirmative; otherwise a verdict of not guilty should have resulted, because the jury was told that if it should find that they were not taken before the Commissioner, the evidence of their admissions or confessions of guilt, the only substantial evidence against them, was not competent and should not be considered. This instruction was based upon the previous opinion of the Supreme Court, which stated, "Concededly the admissions by Freeman, Raymond and Benjamin constituted the crux of the Government's case against them, and the convictions cannot stand if such evidence be excluded. * * *"

The verdict is a clear indication that the jury concluded that the arraignments before the Commissioner took place and we think that the evidence, particularly that of Commissioner Anderson, clearly supports such conclusion.

In this connection, and referring to Section 591 of Title 18 U.S.C.A., appellants assert that, assuming that proceedings were had against them before Commissioner Anderson, they were illegal under the language of that Section, because appellants were not proceeded against "agreeably to the usual mode of process against offenders" in Tennessee. Appellants claim that the hearings which were reputed to have taken place before the Commissioner violated at least three sections of the Tennessee Code. We deem it unnecessary either to cite or discuss these sections. In Roth v. United States, 6 Cir., 294 F. 475, 478, we held that R.S. Sec. 1014, now incorporated in Sec. 591, Title 18 U.S.C.A., did not apply "to procedure in the federal courts, and that defendant obtained no vested right to a preliminary examination before a commissioner." See also United States v. Kelly, 2 Cir., 55 F.2d 67, 70, 83 A.L.R. 122.

Another principal question is, whether the admissions or confessions of appellants were voluntary. This question was passed upon by the court and was likewise submitted to the jury by instructions unexcepted to and we must assume from the verdict that the jury found that they were voluntary. But this does not altogether dispose of this issue. Whether a confession is voluntary is a mixed question of law and fact.

One of the circumstances which led the Supreme Court to reverse our judgment was that appellants were not taken before a United States commissioner for hearing, commitment or taking bail as the law requires [18 U.S.C.A. §§ 591, 595] but that, instead thereof, the confessions were procured by questionings from the officers while appellants were still in their custody and before any order of commitment was issued. Compare United States v. Grote, 2 Cir., 140 F.2d 413. As indicated above, this circumstance is now out of the case and there is no substantial evidence that the confessions were elicted by means of illegal procedure. As pointed out in the McNabb case, supra, 318 U.S. page 346, 63 S.Ct. page 615, 87 L.Ed. 819, "The mere fact that a confession was made while in the custody of the police does not render it inadmissible." This quotation was repeated in United States v. Mitchell, 64 S.Ct. 896, 899. The Mitchell opinion embodies a clarification of its McNabb opinion.

We think that the circumstances in the present setting do not compel the exclusion of confessions upon the ground that they were involuntary. These circumstances were detailed in the previous opinions. The juristic difference between a voluntary or admissible, and an involuntary or inadmissible, confession is well stated in the dissenting opinion of Mr. Justice Reed in the Mitchell case, where he said:

"If the confession is freely made without inducement or menace, it is admissible. If otherwise made, it is not, for if brought about by false promises or real threats, it has no weight as proper proof of guilt. Ziang Sung Wan v. United States, 266 U.S. 1, 14, 45 S.Ct. 1, 69 L.Ed. 131; Wil-

908

son v. United States, 162 U.S. 613, 622, 16 S.Ct. 895, 899, 40 L.Ed. 1090; 3 Wigmore Evidence, 1940 Ed., § 882."

Appellants Freeman and Raymond were questioned off and on the evening of August 1st after they were told by the Alcohol Tax Unit Agents that they need not fear force and that they need not make any statements unless they desired to do so, for any statements they did make would be used against them. They were questioned on the nights of August 1st and 2nd but they were not kept awake for an inordinate length of time as in Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166; nor were they kept in the Alcohol Tax Unit offices continuously for any excessive period, although there is some evidence that Benjamin was kept in the offices for five or six hours on August 2nd and that all the appellants were kept in the offices for about four hours on that night. There is no evidence that they were harassed by strong lights or were examined by relays of questioners. Appellants testified that they were called liars, and the officers admitted that on occasions they told the accused that they were lying, but at those times the officers already had data from other witnesses and from their own observations and discoveries against which they checked appellants' statements.

Appellants testified that they were threatened and cursed and that one of them was struck by an officer with a rolled piece of paper. The officers denied these charges, but, even if true, they do not reflect the harsh treatment, which, in the Lisenba case was not considered a denial of due process.

Benjamin McNabb, accompanied by his parents, voluntarily surrendered between 8 and 9 o'clock on the morning of August 2nd. He was asked to remove his clothes (to observe whether he had been wounded) and he testified that he was frightened. He re-dressed almost immediately. He was not subjected to any blows or indignities. He was questioned by the officers and after two or three hours he agreed to make a statement which was taken down by a stenographer. Her testimony was that she started to take the statement at 12:15 P. M., August 2nd. This was after appellants had been taken before Commissioner Anderson. The stenographer was disinterested and certain portions of her testimony are of special interest on the question of coercion, to-wit:

"X 17. During the time of this statement, would the officer step out at various times and tell you not to put down anything and then start their questions over again? A. I do recall that Captain Beeman . . . reformed a question or two, and he might have gotten a little ahead of me and I stopped him, outside of that, I don't remember anything else.

"X 18. Would they ask him questions and ask you to not put them down? A. I don't recall that they did.

"X 19. Was it a slow examination, or fast? A. They took their time, didn't seem to be in any hurry.

"X 20. What sort of condition did Benjamin McNabb appear to be in? A. He seemed to be—that he wanted to tell the truth, he was calm as far as I could see.

"X 21. Was he perfectly calm? A. Yes, sir.

"X 22. He answered the questions without hesitation? A. Yes sir, he did."

On re-direct she was asked:

"RD 1. You were asked on Cross-examination if you knew of any promises or threats made before you were down there, were there any promises made to Benjamin McNabb, or threats made to him while you were down there, by these Alcohol Tax men? A. No, sir.

"RD 2. Did anybody offer to hit him? A. No, sir, nobody touched him."

The final statement in the "confession" of Benjamin McNabb was as follows:

"Q. You understand of course, that we are making an investigation of a murder; that we wish to obtain the facts. You were in possession of certain facts which you have related to us, and that now you have given us these facts you have given them voluntarily and that we can use them for such purpose as" (we) "wish. Do you understand that? Is that agreeable to you? A. Yes, sir.

"Q. You want the truth to be know (sic) and this is agreeable? A. Yes, sir, and what I told is the truth."

We find nothing in the record to justify a conclusion that the atmosphere surrounding the examination of appellants indicated coercion or violence, either mental or physical, such as would constitute a denial of due process.

Appellants complain that after their commitment they were removed from jail

for the questionings, in violation of Sec. 605 of Title 18 U.S.C.A. The point is without merit. Assuming that their removal was without authority, it does not follow that it changes the circumstances under which the confessions were made. See United States v. Mitchell, supra.

■ On the question of whether the evidence supports the verdict, the facts are concededly the same as at the former trial, with the exception of the testimony of one Pryor Hester, who was for a time in the same cell block with Benjamin and Freeman and who testified that Benjamin stated that he fired the first shot and that Freeman said that he fired one shot but didn't know if it was the fatal one. Aside from this, the evidence was fully discussed in our first opinion and was found to support the verdict. We have reached the same conclusion and the judgment below is affirmed.