## TYLER v. UNITED STATES.

### No. 10828.

United States Court of Appeals
District of Columbia Circuit.

Argued April 16, 1951.

Decided Nov. 8, 1951.
Writ of Certiorari Denied March 24, 1952.
See 72 S.Ct. 639.

James T. Wright, Washington, D. C., with whom James M. Leak and Barrington D. Parker, Washington, D. C., were on the brief, for appellant.

Richard M. Roberts, Asst. U. S. Atty., Washington, D. C., with whom George Morris Fay, U. S. Atty. at the time the brief was filed, and Joseph M. Howard, Cecil R. Heflin, and Raymond E. Baker, Asst. U. S. Attys., all of Washington, D. C., were on the brief, for appellee.

Charles M. Irelan, appointed U. S. Atty., Washington, D. C., subsequent to the argument in this case, also entered an appearance for appellee.

Before CLARK, PRETTYMAN, and PROCTOR, Circuit Judges.

PROCTOR, Circuit Judge.

This appeal is from a judgment of conviction and mandatory death sentence [1] for murder in the first degree [2] as charged in two counts of an indictment, each alleging the murder of a man, in perpetrating the offense of housebreaking while armed with a dangerous weapon. (See third and fourth counts of indictment, J. A. 1.)

During the night of April 6, 1950, Oliver R. Hess and John C. Carpenter, watchmen in Lansburgh's Department Store, were murdered. Each had been stabbed several times in the chest and back. Indications pointed to their slayer's having entered the store with intent to pillage the cash room.

On May 5th, William A. Tyler, Jr., (appellant) was arrested by the police for robbery and assault to kill. The charges were unconnected with the Lansburgh murders. He was taken before the United States Commissioner, formally charged with those offenses and committed to jail for a later hearing. Before going to the Commissioner, the police questioned Tyler concerning the murders. He denied any

---

1. 22 D.C.Code, § 2404 (1940).
  "The punishment of murder in the first degree shall be death by electrocution. * * * (Mar. 3, 1901, 31 Stat. 1321, ch. 854, § 801; Jan. 30, 1925, 43 Stat. 798, ch. 115, § 1.)"

2. 22 D.C.Code, § 2401 (1940).
  "Whoever, being of sound memory and discretion * * * without purpose so to do kills another in perpetrating or in attempting to perpetrate any * * * housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree. (Mar. 3, 1901, 31 Stat. 1321, ch. 854, § 798; June 12, 1940, 54 Stat. 347, ch. 339, § 1.)"

participation. Many Lansburgh employees were given the lie detector tests. At the officers' suggestion Tyler consented to take a lie detector test, asserting it would prove his innocence. The next morning, May 6th, he was delivered by the jail authorities to Detectives Furr and Hartnett of the Metropolitan Police, and taken to police headquarters, where arrangements had been made for the test to be given by Captain Curley of the United States Army, a polygraph expert, engaged in such work for the Army. Curley arrived late, about 1:30 p. m. Tyler was turned over to him. They were left alone in a separate room.

According to the Government's proof Curley advised Tyler he did not have to take the test and should not do so unless he thought he could be cleared. Tyler expressed his willingness. Curley testified that he then explained "all of the techniques of the examination so that he [Tyler] would be fully aware of what was going to happen." Further, Curley testified:

" * * * I ran one examination at which time I stopped the machine, the examination was four minutes long, and I advised William Tyler that we could not continue with the test unless he really desired to cooperate. He attempted to, what we call, beat the machine by abnormal breathing, and so distorting the chart.

" I told him that unless he really wanted to continue with the test, we couldn't do it."

* * * * * *

" * * * He admitted that he had been taking deep breaths and he decided that he would like to continue with the test.

" * * * We ran another test about 11 minutes. At the end of that test I stopped the machine and advised William Tyler of the reactions that I received. He stated at that time that he didn't want to take any more of the test.

"I advised him that the reactions were indications that he was lying to me, and for him not to continue unless he was going to be able to tell me the truth.

" * * * He stated that he didn't want to take the test any longer and for me to take the blood pressure cuff and electrodermal unit off of him.

" * * * after a while I spoke to him about the test, it was approximately an hour—he stated that he did do this thing and that he would like to make a statement about it."

* * * * * *

" * * * He stated that he wished to make a complete statement of the Lansburgh killings, and that he would like to have Detective Furr brought in in order to make the statements to him." [Curley—J. A. 92, 93.]

Furr being out of the building, Curley asked Tyler if he would give the statement to some other officer. Tyler replied, "no, he would much prefer to wait for Detective Furr because he had talked to him for several hours earlier and he was a very nice police officer, * * *"[3]

When Furr came into the room where Curley and Tyler were waiting, Tyler told Furr that he wished to make a statement and have Furr put the same in writing. Then, Tyler proceeded with his statement to Furr in Curley's presence. He recounted incidents leading to his entrance into the Lansburgh store and killing of the guards. Then his statements, as written by Furr, were supplemented by answers to questions put by Furr. When completed, the writing was signed by Tyler and Furr. [Curley—J. A. 98, et seq.; Furr—J. A. 111.][4]

After the confession Furr asked Tyler if he would go and show him where Tyler had secured rope which he had used at the Lansburgh store. Tyler agreed, and they went to Stanton Terrace in the southeast section of Washington following the directions of Tyler to premises he pointed out as the place he had gotten the rope. [J. A. 115.] Tyler also consented, at Furr's request, to go to the Lansburgh store to "re-enact the crime." There, Tyler led a group of six, including officers Furr and Hartnett,

3. Tyler was probably referring to conversations with Furr in connection with the robbery case and during the morning at police headquarters while waiting for

Curley. See Furr's testimony, J. A. 107 et seq.

4. See *Appendix A* to this opinion for confession.

and Mr. McIntosh, manager of the store, from place to place about the building, describing in detail his entrance therein; his movements in and about the same; his procurement of the knife with which the watchmen were slain when separately encountered by him on different floors, and his efforts to get at the money supposedly in the cash room. [McIntosh—J. A. 139–150.][5] Many incidents related by Tyler and many proven circumstances tend strongly to show the truth, accuracy and voluntary nature of Tyler's statements at the store and at police headquarters.

Upon leaving Lansburgh's, Tyler was delivered by the detectives to a United States Marshal and returned to the jail. Later that day, about 9:30 p. m., he was taken before United States Commissioner Lawrence, and charged with the murders. He was advised by the Commissioner of the nature of the charges, of his right to a hearing, to counsel, to a continuance; warned that any statements might be used against him, and that he did not have to testify or make any incriminating statement. He was asked if he wanted to get a lawyer, and told that he was entitled to a continuance to obtain one, but Tyler said, " * * * no, he wanted to go ahead right then, or words to that effect." Whereupon Detective Furr testified.[6] Then the Commissioner reviewed the testimony of Furr. [J. A. 105.] Addressing Tyler he said, " * * * Officer Furr has testified that you have made statements to him that you had entered Lansburgh's Store for the purpose of robbery; that while in the store there you ran into these two men up there and that you took a knife and stabbed them. In other words, he said that you admitted that you killed them." The Commissioner then asked Tyler if he wished to cross-examine Detective Furr. Tyler replied, "No, what he says is right. I asked for him." Tyler

added that he went into the store only to rob; that he "just bumped into" the watchmen. [J. A. 105–106.] Tyler was then formally held upon the murder charges, recommitted to the jail and returned there by the marshal.

Two days later, May 8th, Tyler was interviewed in the jail by one Gilkey in the course of Gilkey's duties as supervisor of classification at the institution. Gilkey asked Tyler about the charge upon which he was committed. Whereupon, Tyler repeated in substance the written confession he had made the previous Saturday to Detective Furr at police headquarters. [J. A. 237, et seq.] [7] In so testifying Gilkey's recollection was refreshed by a memorandum he had made during the interview. [J. A. 237, et seq.]

Tyler, testifying in his own behalf, denied participation in the Lansburgh crimes. He and members of his family testified that he was home throughout the night of those occurrences. [J. A. 198, 163, 169, 174.] He also testified that *he had gone willingly from the jail to police headquarters for the lie detector test and willingly underwent the same to the point where Captain Curley accused him of lying.* [J. A. 123, 132.] Further, he testified that at headquarters he was questioned continuously by detectives from about 9 a. m. until between 12 or 1, when Captain Curley arrived [J. A. 123, 124]; that Curley and his assistant, Fitzsimmons, told him it would be better to confess [J. A. 124] [8]; that he remained with Curley about 3½ hours [J. A. 125]; that when Curley said he lied, he (Tyler) "told him I quit." [J. A. 131.] Then he, Tyler, was taken downstairs by the officers and subjected to more questioning; that officer Hartnett started "banging" him [J. A. 125]; slapped him in the face and broke a tooth [J. A. 126]; that they twisted the handcuffs on his wrists, leaving deep ridges

---

5. Tyler was familiar with the store, having worked in the tearoom for several months on two occasions in 1948, 1949. He was also in the store with one Roy the afternoon preceding the murders, and according to Roy's testimony proposed that they burglarize the store. [J.A. 32, et seq.]

6. The appendix does not contain Furr's testimony before the Commissioner. The hearing was not reported.

7. See extract of Gilkey's testimony concerning confession, *Appendix B* to this opinion.

8. Denied by Fitzsimmons [J.A. 242], and Curley [J.A. 251].

[J. A. 126]; that he had no food, water, or cigarettes until after the confession [J. A. 128, 129] [9]; that one officer intimated his parents and sister were implicated and might be arrested [J. A. 129]; and that finally he "gave up." He testified, "I was just tired, sick, drowsy, didn't care what happened. I knew just as well if I stayed up there, they might have killed me by beating me, so I just took the chance. I just told them something to get away from them, and get in the custody of someone else." [J. A. 128.] As to the confession, Tyler testified that it was written down by officer Furr. "He put it to me like questions. * * * they were just asking me questions and putting them into my mouth and letting them come out like answers." [J. A. 128.] Further, Tyler testified that he did not see what was written by Furr; that the writing was not read to him; that Furr put it in front of him and told him to sign [J. A. 226]; that he did not go willingly to Lansburgh's store with the officers, but was threatened and taken there against his will [J. A. 223]; that he did not lead the way about the store, and that officer Hartnett was doing the leading. Although his testimony concerning statements to Commissioner Lawrence and to Gilkey was equivocal and vague, we think its effect was to deny that he made any incriminating statements to either of those witnesses. [R. 821, 830, 831, 852.]

There was little, if any, evidence supporting Tyler's testimony of brutal and coercive treatment. There was much evidence in direct contradiction, some by witnesses unconnected with the police department and some in the nature of undisputed facts and circumstances. Although the foregoing review of the extensive evidence is not complete, we have endeavored to go far enough to fairly reflect the setting in which arise the principal points on this appeal.

Those points involve, among others, the written confession made by Tyler at police headquarters on May 6th, the day following his commitment to jail by the United States Commissioner for hearing on the robbery and assault charges.

■■ The first point concerns the failure of the trial judge to hold a preliminary hearing, *without the jury's presence*, as to the voluntary nature of the written confession. This seems to have resulted from a misunderstanding between court and counsel. [J.A. 95, 96, 120, 121.] However that may be, the judge did defer a reading or view of the writing to the jury until after all evidence from *both* sides was received upon the question. [J.A. 120, et seq.; 150, et seq.] This evidence developed a definite conflict as to whether the confession was voluntary. Therefore, it became necessary that the court submit final determination of the issue to the jury. McAffee v. United States, 1940, 72 App.D.C. 60, 111 F.2d 199, certiorari denied, 1940, 310 U.S. 643, 60 S.Ct. 1094, 84 L.Ed. 1410; Catoe v. United States, 1942, 76 U.S.App.D.C. 292, 131 F.2d 16. This was done under proper instructions in the court's charge. [J.A. 253–4.] Although the usual procedure of a preliminary inquiry by the judge was not followed, still, in view of the issue which developed, it finally turned out that the matter had to be heard and determined by the jury. Obviously, therefore, no harm was done by the fact that the evidence was heard in the first instance before the jury. Clearly, the defendant suffered no prejudice, for a preliminary hearing would have had exactly the same result.

■ It is also contended that the written confession was made to Detective Furr during a period of illegal detention by the police, and therefore is barred as evidence under the rule laid down by the Supreme Court in McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, expounded in Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100. In support of this contention sections 408, 413 and 414 of Title 24, District of Columbia, Code (1940) [10],

---

9. According to the Government's evidence he was given a sandwich and coffee around noon [J.A. 110, 111] and other sandwiches later in the afternoon [J.A. 88, 100].

10. 24 D.C.Code § 408 (1940). "Whenever and wherever authority of law exists to sentence, commit, order committed, or confine any person to or in the jail of the District of Columbia or the Wash-

are cited as restricting custody of a prisoner in the Washington Asylum and Jail to its superintendent, and for limited purposes to the United States Marshal and his deputies. Hence, it is argued that delivery of Tyler by the jail officials to policemen Furr and Hartnett for the purpose of going to police headquarters for the lie detector test was without legal authority and rendered Tyler's detention by the police illegal and his confession to them inadmissible. Technically we doubt that legal custody was affected by the temporary delivery of Tyler to the police officers. A sounder view would seem to be that the officers thereby became agents of the superintendent, and while in their care Tyler continued, in legal contemplation, to be in custody of the superintendent. We doubt too that Tyler is in any position to raise the question, for by his own admission on the witness stand, he consented to go with the officers to police headquarters to take the lie detector test. In any event, we do not think that illegal detention, of itself, is enough to vitiate a confession. We gather from the McNabb, Mitchell[11] and Upshaw cases that the rule applies only to inculpatory statements made during illegal detention *due to failure promptly to carry a prisoner before a committing magistrate.* For the purpose of the rule, as declared by those decisions, is to enforce procedural requirements (former 18 U.S.C. § 595, and Rule 5(a), Federal Rules of Criminal Procedure, 18 U.S.C.A.) that an arresting officer promptly take his prisoner before a committing magistrate. Here the situation is different. Tyler had been

duly committed to the jail by the United States Commissioner upon other charges. He was in legal detention. He was not being wrongfully deprived of his liberty. Assuming, as we do, that the jailer transgressed his authority in turning the prisoner over to the police officers, that presents a question unrelated to admissibility of the confession. The Supreme Court has held in McNabb, 318 U.S. at page 346, 63 S.Ct. at page 615, and Mitchell, 322 U.S. at page 68, 64 S.Ct. at page 897, that "The mere fact that a confession was made while in the custody of the police does not render it inadmissible." McNabb v. United States, 318 U.S. at page 346, 63 S.Ct. at page 615. Nor are we lacking in direct support for our conclusion. The very question arose in the second trial of the McNabbs, after the Supreme Court reversed their first conviction. As to two of the defendants, Freeman and Raymond McNabb, the facts were essentially like those of the present case.[12] They were committed the morning of August 1 by the United States Commissioner for later hearing upon charges of violating the Internal Revenue Code. After their commitment to jail they were taken by agents of the Alcohol Tax Unit to the federal building and questioned by them for long periods during that day and night concerning the killing of an Internal Revenue officer the previous night at a raid upon the McNabb whisky still. The next day, August 2d, Benjamin McNabb surrendered to the revenue officers. They then proceeded to question him as also Freeman and Raymond. Thereafter all three were charg-

ington Asylum of said District, said authority shall be exercised by sentence, commitment, order of commitment, or confinement to or in said Washington Asylum and Jail. (Mar. 2, 1911, 36 Stat. 1003, ch. 192.)"

24 D.C.Code § 413 (1940). "Nothing in sections 24-412, 24-415 shall be construed to impair or interfere with the authority of the marshal of the District to commit persons to the jail or to produce them in open court or before any judicial officer when thereto required. (Mar. 3, 1901, 31 Stat. 1379, ch. 854, § 1193.)"

24 D.C.Code § 414 (1940). "It shall be the duty of the superintendent of the

Washington Asylum and Jail to receive such prisoners and to deliver them to the marshal or his duly authorized deputy, on the written request of either, for the purpose of taking them before any court or judicial officer, as provided in section 12-413. (Mar. 3, 1901, 31 Stat. 1379, ch. 854, § 1194; Mar. 2, 1911, 36 Stat. 1003, ch. 192.)"

11. U. S. v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140.

12. See Transcript of Record, McNabb v. United States, No. 9663, United States Circuit Court of Appeals for the Sixth Circuit; also statement of facts in opinion.

ed and arraigned before the Commissioner for murder of the revenue officer, and committed to jail for later hearing. At the trial these facts, together with incriminating statements made by the defendants to the officers in the course of their questioning on August 1st and 2d were received in evidence. Upon appeal to the Sixth Circuit Court of Appeals it was contended that the statements were inadmissible by reason of illegal custody and detention by the revenue officers. The court held the point to be without merit. They said: "Appellants complain that after their commitment they were removed from jail for the questionings, in violation of Sec. 605 of Title 18 U.S.C.A. The point is without merit. Assuming that their removal was without authority, it does not follow that it changes the circumstances under which the confessions were made. See United States v. Mitchell, supra." McNabb v. United States, 6 Cir., 1944, 142 F.2d 904, 908. The question was made the principal ground of a petition for review by the Supreme Court. Certiorari was denied. McNabb v. United States, 323 U.S. 771, 65 S.Ct. 114, 89 L.Ed. 616. We conclude that the fact that Tyler was in the temporary care of the police at the time of the written confession did not render the same inadmissible at his trial. Nor do we think that the confession was vitiated by failure to take Tyler before the Commissioner sooner on the murder charge, for he had been legally held under the earlier commitment, was not then wrongfully deprived of his liberty, and presumably when before the Commissioner, a few days before, was advised of his rights to counsel and to refrain from making any statement. Fed.R.Crim.P. 5 (b). We think any such extensions of the McNabb rule would not be in the public interest. Although familiar with the recent opinions in the Carignan case, Carignan v. U. S., 9 Cir., 1950, 185 F.2d 954, we disagree with the view expressed by the majority that the McNabb rule operates to bar a confession obtained by questioning of a prisoner upon a different charge than that upon which he has been committed.

■■ Again, as to the written confession, counsel insist that the evidence established that it was induced by force and duress and so was inadmissible. Of course preliminary admission of the confession by the court did not foreclose final rejection by the jury if they found it to be involuntary. Whether it should be accepted or rejected was left squarely to their determination. Admittedly there was a question as to whether the confession was voluntary. Yet counsel seem to argue, notwithstanding the contradictory nature of the testimony, that their own interpretation of some parts of it, to the exclusion of all others, and of all opposing inferences, should have been accepted as establishing their claim that it was coerced. [13] Upon the basis of the Government's evidence, we think the court was right in admitting the confession, subject to final determination by the jury, upon all the evidence, as to its voluntary nature. Whether it was accepted by them we do not know.

■ It is also argued that without the written confession there was insufficient

---

13. They argue that the evidence establishes Tyler was given nothing to eat throughout the day, although evidence of the Government strongly contradicts them. They also argue that testimony of the jail dentist, Dr. Shumate, supported Tyler's claim that he sustained a fractured tooth by a blow on the face from one of the officers. Yet there is strong direct and circumstantial evidence in contradiction, and Dr. Shumate's testimony does not, we think, support the conclusion they attempt to draw from it. He testified there were no contusions or abrasions and that the appearance of Tyler's face was normal. " * * * from my diagnosis of what was presented to me, I would say that what had caused the tooth to fracture or to be broken off was something that had happened over a period of many months * * * the tooth was very carious, full of decay, leaving the enamel very much unsupported by normal dentine, which would normally give cause for a fracture of the enamel of a tooth even under normal mastication. Normal chewing would have caused that very easily." It may be noted too that the testimony reveals no complaint by Tyler to the doctor of blows on his jaw. [J. A. 196, 197.]

evidence to justify submission of the case to the jury and to support the guilty verdicts. But we think there was ample evidence. Omitting any detailed statement, we need only refer to Tyler's incriminating acts and statements at the store in "reenacting" the crime, his admissions to the Commissioner *at the hearing* and, two days later, his confession to Gilkey at the jail. Although this evidence was denied by Tyler, its admissibility is not questioned. Indeed, that would be quite impossible as to those statements made by him at the Commissioner's and the jail.

■ Another point urged in support of the appeal is that proof of the *corpus delicti* of the offenses charged rested solely upon the confessions. The argument disregards independent evidence of the mutilated and lifeless bodies of the two guards in the store, the bloody butcher knife near the body of one, and that stab wounds caused the death of both; also physical indications that the store was entered from a rear window, and the cash room forced open. We think there is no merit to the contention.

■ During the testimony of Captain Curley, counsel for Tyler moved at the bench to strike the same, especially that part covering Curley's statement to Tyler that the lie detector machine indicated he was lying. The court denied the motion, adopting the view that the testimony was relevant as revealing circumstances leading to the confession, although not as proof of the correctness of Curley's statement. [J.A. 95.] So the jury would at once understand, the court suggested that counsel restate his motion in open court. This was done. Whereupon the court denied the motion, and informed the jury that, "The statement of the witness that he told the defendant that the machine indicated he was lying is not admitted as evidence of any alleged lying of the defendant, but merely as evidence bearing upon the question whether the confession was, in fact, voluntary." [J.A. 97–98.] We think the ruling was correct. This court has held the results of a lie detector test to be inadmissible. Frye v. United States, 1923, 54 App.D.C. 46, 293 F. 1013. We

do not mean to impair that ruling. But here the circumstances are different. The evidence had a material bearing upon the conditions leading to Tyler's confession and was relevant upon the vital question as to whether the same was voluntary. With the court's clear and positive instruction to the jury, holding the evidence within proper bounds, and the presumption that the instruction was followed by the jury, we are not warranted in assuming that any prejudicial results followed from the incident. Moreover, in view of the later confessions, which the jury doubtless accepted as true, and which necessarily implied an admission by Tyler that his earlier denials of guilt were false, obviously no prejudice could finally have resulted from the testimony. Then too, the testimony did not reveal the nature of Curley's questions or of Tyler's answers. So there was nothing to indicate to the jury what particular statements Curley had reference to when he told Tyler there were indications he was lying.

Many other points are offered in support of the appeal, which we shall not discuss in detail. We have, however, considered all carefully. In our opinion none presents any harmful or reversible error.

The judgment of the District Court is Affirmed.

### Appendix A

" 'Sixth of May, 1950, 4:00 p. m.

" 'Statement of William Andrew Tyler of 2302 Pomeroy Road, Southeast.

" 'On April 6, 1950, in the afternoon about 5 p. m., Howard Roy and I went to Lansburgh's Department store and looked the place over with intent to rob it that night or some other night.

" 'We went to the mezzanine tearoom and looked at the window, the one that wouldn't lock; the one where I used to let the garbage out.

" 'We left the store about 5:30 p. m. and went home. Howard Roy left me and I went on home.

" 'That night, the same date or day, I left my house about 12 midnight and went to Lansburgh's by streetcar, and I walked around the block about three times. There

was two men in the front of 7th Street working on the doors.

" 'About 12:15, or so, I started to work my way into Lansburgh's by climbing a rope in the alley, and then opened the window on the mezzanine floor.

" 'I went in the kitchen of the tearoom and reached up on two of the air pipes, the big pipe in the kitchen, and got a knife. I waited up on the mezzanine watching the guard that was in the front. While I was watching where the guard was, I took the screws off the cigarette case beside the cash register and took two packages of Philip Morris. I left them there and walked up the steps beside the tearoom to the fourth floor of the main building; crossed over from the main building to the Bush Building. Then a passageway, and went down to the first floor to the cashier cage.

" 'I tried the door to the cashier's cage and could not open it and went back upstairs to the 6th floor. I used the Bush Building stairs beside the freight elevator. I got to the 6th floor and saw the elevator on that floor.

" 'I should have told you that just before I got to the 6th floor I saw a light on the elevator and thought someone were on the 6th floor. As I got to the top of the stairs the door on the 6th floor opened and a guard came out and looked down the steps and saw me. He reached for his gun and we tussled and some way I got him down. He was on the floor face down. I stabbed him. I dragged him by his feet through the door into the corridor on the 6th floor. I took his flashlight.

" 'Then I went to the safe or cabinet on the 6th floor and found the door unlocked. I didn't find anything in there. So I went inside the cash cage on the 6th floor and opened the drawers and didn't find anything. So I went back down the stairs to the cashier's cage in the Bush Building. I tried the door again and still couldn't open it. I tried to break a window with the flashlight. The window wouldn't break. I tried to break the door panel and pushed against the door, and it came open. I had been pushing on the wrong side. I left the door open and propped it open with a broom.

" 'I went back downstairs to the main floor and saw the other guard standing by the door at the elevator, and with his back to me. I grabbed him and threw him down and bound and gagged him. I drug him in the bathroom. I went back up to the cashier cage and opened the door and started searching the drawer and desk and closet, and found nothing. I came back downstairs to the bathroom and saw the guard untying himself, and he yelled for help, and I grabbed him again. We started to wrestle and I pulled a knife and stabbed him.

" 'I forgot to tell you that after I tied up the second guard, I went to the cosmetic counter and took a bag from the counter and took the tray out and took the bag with me back up to the cashier cage. Then I started to search.

" 'I forgot to tell you that after I had stabbed the second guard, he was lying on his back and he had his wallet clutched in his hand, and I took the wallet from him and from his hand, and it contained $51.00 and some odd cents, and some tokens.

" 'I left the store through the E Street door. The key was already in the door. I caught a cab and went home.

" 'I have made the above statement of my own free will without threats or promises from the police officer or anyone.

" 'Question: Where did you get the rope you used to tie up the second guard? Answer: I got it from a woman's clothesline up at Stanton Terrace, almost in the middle of the block.

" 'Question: Did you use a piece of this rope for anything before you actually went to the store? Answer: I tied the two prongs on the rope together in the back to keep them from rattling.

" 'Question: What did you use to tie up and gag the second guard? Answer: I used a piece of cloth from the counter and a knitted silk scarf.

" 'Question: Whose scarf and handkerchief was it you used? Answer: It was my scarf and my handkerchief.

" 'Question: Do you remember what you did with the knife? Answer: I don't think I do.

" 'Question: Do you remember if the second guard had anything else in his hand or pocket? Answer: He had some keys.

" 'Question: Why didn't you take the first guard's gun? Answer: I just had no intention to; didn't expect anyone else to be in front of me.

" 'Question: Were the two men still working on the 7th Street door when you left? Answer: I don't know. I was trying to get out of there.

" 'Question: When you were in the store, did you at any time walk up the steps from the basement to the 7th Street doors? Answer: No.

" 'Question: When you worked at Lansburgh's did you ever have any trouble with any of the guards? Answer: No, sir.

" 'Question: What was the main reason you went into Lansburgh's that night? Answer: To rob.

" 'Question: Were you mad at either of the guards? Answer: No. I wasn't mad at any of them.

" 'Question: Who was with you this night? Answer: I was all alone. No one was with me.

" 'Question: Why didn't Roy go with you? Answer: Too many get messed up.

" 'Question: You said earlier you tied up the second guard with a cloth from one of the counters. How did you do this? Answer: I took it off the counter and tore a piece of it off. I think I used it to tie his hands.

" 'Question: You stated you struggled with the first guard in the hallway. How did all the blood get on the elevator? Answer: We were wrestling in the hallway and some way we got into the elevator and that is where I stabbed him.

" 'Question: William, have you made this statement of your own free will without anyone threatening you or beating you? Answer: Yes.

" 'Question: Do you know any statement you make will be used against you in Court and by your Constitutional rights you don't have to make a statement? Answer: Yes, sir; that is right.

" 'Statement completed 5:20 p. m., 5/6/1950.

" 'Signed: William Andrew Tyler, Jr.
" 'Lloyd B. Furr,
" 'Detective Sergeant,
" 'Detective Bureau, witness.' "

Appendix B

Refreshing his recollection from notes he made May 8th at the time of his interview with Tyler, Earl W. Gilkey testified that Tyler said "he walked through the alley to the back of the store, and climbed up a rope to the second floor. * * * He went to the mezzanine floor to the tearoom, to the kitchen. He got a knife out of the place where he knew it was on the top of the airconditioning pipes. * * * he stayed up there for a while watching the guard up at the front. * * * it was a tall man. * * * He stayed there a short time, he specified between 15 and 20 minutes, and then went to the cashier's cage where she kept cigarettes and things. * * * he got two packages of * * * cigarettes. * * * [He] Went up to the fourth floor and went into the Bush Building where they keep all the stock. Then he went down to the first floor in the Bush Building to the cashier's cage, and tried to open the door and couldn't open it. He went up to the 6th floor, but before he got to the 6th floor—almost got to the 6th floor, he saw the light from the elevator shining on the wall, and he backed up against the wall and he said, 'This short guard'—he didn't identify him by name, but * * * this short guard was there and must have heard him coming up the steps. 'He looked around the corner and saw me— * * * and I saw him. We struggled in the hall.' * * * he got him into the elevator with his face lying down, and he pulled a knife and stabbed him. He didn't remember stabbing him but once. He said, 'They tell me I stabbed him more times. I grabbed him by his ankles, pulled him into the hall of the 6th floor,' and then he went to the safe. He looked at the safe but it was unlocked. * * * opened it, and looked inside. * * * found a lot of books and records left there, * * * then he went back to the cashier's cage on the 6th floor, searched the drawers; didn't find anything, and then went back downstairs to the first floor. * * * tried to

**34**

break the door open to the cashier's cage, but * * * couldn't do it, so * * * put his shoulder against the door and it came open. * * * he propped the door open with a broom. * * * he was on his way downstairs to the first floor, main building. 'When I got to the first floor door, the guard was standing in the doorway with his back turned toward me. I crept up and grabbed him. He yelled for help but I had my hand over his mouth. I drug him into the bathroom, bound and gagged him. I went back upstairs to the cashier's cage. I searched the drawers and closets and desk, and didn't find anything. I went back downstairs to the bathroom to see if this other guard was still tied up. As I got to the door, he was untying himself. As he came out of the door, I pushed him back in. He yelled for help again. We struggled. I pulled the knife and stabbed him. I was about to leave and turned around and looked back and saw his wallet in his hand. I took the contents out of the wallet, amounting to $51.00 and some odd pennies and car tokens. I left the store through the E. Street, Northwest, door. It was early morning when I left.' "