Elmer DAVIS, Jr.

v.

STATE OF NORTH CAROLINA.

Civ. No. 1302.

United States District Court
E. D. North Carolina,
Raleigh Division.

Sept. 10, 1963.

Charles V. Bell, W. B. Nivens, Calvin L. Brown, Charlotte, N. C., for petitioner.

T. Wade Bruton, Atty. Gen. of North Carolina, Raleigh, N. C. (Harry W. McGalliard and James F. Bullock, Asst. Attys. Gen. of Atty. Gen.'s Staff at Hearing), Kenneth R. Downs, Charlotte, N. C., for respondent.

BUTLER, Chief Judge.

This is an application for a writ of habeas corpus on behalf of Elmer Davis, Jr., now confined in the State Prison at Raleigh, North Carolina, under a sentence of death imposed by the Superior Court of Mecklenburg County, North Carolina, upon the applicant's conviction of murder while perpetrating the crime of rape.

The basis of the application is the admission of a confession in the state trial which the applicant contends was involuntary and obtained in violation of his right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution.[1] At the trial objection to the introduction of the confession on this ground was timely made and determined adversely to the applicant. The finding of the trial Judge was affirmed on appeal as supported by substantial evidence. State of North Carolina v. Davis, 1960, 253 N.C. 86, 116 S.E.2d 365, rehearing denied November 18, 1960, cert. denied, 1961, 365 U.S. 855, 81 S.Ct. 816, 5 L.Ed.2d 819. Thereafter, application was made to this court and relief was denied without a hearing upon consideration of the state court records. Davis v. State of North Carolina, D.C.N.C., 1961, 196 F.Supp. 488. The Fourth Circuit Court of Appeals, 310 F.2d 904, reversed and remanded for a hearing. Accordingly, a plenary hearing was held in order to determine the unresolved issues of fact surrounding the confession.

The facts in the case are sharply in dispute. The evidence offered at the time of trial is set out in the above-cited opinion of the North Carolina Supreme Court and is substantially the same as that produced at the hearing before this court.[2] Upon consideration of the record in the state court and the evidence offered at the hearing, the court finds the following historical facts:

1. On September 21, 1959, the day after the murder of Mrs. Foy Bell Cooper in Charlotte, North Carolina, Elmer Davis, Jr. was arrested and brought to the city jail in Charlotte, where he was held until October 6, 1959, the date of his confession.

2. At the time of arrest Davis was an escapee from a North Carolina prison where he was confined under sentences of 17 to 25 years for robbery and assault with intent to commit rape.[3] He was wearing clothing other than his prison uniform and had in his possession several articles of women's underwear and a billfold containing papers bearing the name of Bishel Buren Hayes.[4]

Davis had been previously convicted of five criminal offenses, including housebreaking and entering, larceny, robbery, and assault with intent to commit rape, and had served three prior prison sentences aggregating 7 to 8 years in addition to his currrent sentences of 17 to 25 years. He had escaped four times during his several prison terms, resulting in additional prison sentences. Davis was 29 years old. He had completed the third or fourth grade, and from his testimony at the hearing he appeared to be of low average intelligence.

3. Upon taking Davis into custody, the police notified the State's Director of Prisons and obtained permission to hold the prisoner pending an investigation of the sources of the articles found in his possession at the time of arrest and his activities since his escape. At all times from September 21 through October 6,

---

1. A written confession and several oral confessions were admitted in evidence at the trial. Inasmuch as the evidence reveals substantially similar attendant circumstances, the confessions are treated alike.

2. All of the witnesses who testified at the state trial concerning the confession testified at the hearing on this application, and three additional witnesses: G. S. Ross and Harold Fesperman of the Charlotte

Police Department, and Eloise Stowe, the applicant's sister.

3. These offenses had been committed within two blocks of Elmwood Cemetery, the scene of the Cooper murder.

4. Hayes testified at the state trial that he had been drinking heavily near Elmwood Cemetery on the day of the Cooper murder and that his billfold, shoes, and socks were taken from him while he was asleep.

Davis was held under the authority of the North Carolina Director of Prisons and was serving the sentences from which he had escaped.

4. The Charlotte City Jail, where Davis was confined, is an "overnight" jail without facilities for the preparation of hot meals. Prisoners who are held by the Charlotte Police Department for more than a few days are generally confined in the Mecklenburg County Jail in Charlotte, where cooking facilities are available. Prisoners in the city jail are fed twice daily, each meal consisting of two or more sandwiches. While confined, Davis received food similar to that of other prisoners at regular intervals. During one day, he received two hot meals outside the jail and on another occasion received two hamburgers and milk. Periodically, he was provided with peanuts, soft drinks, cigarettes, and like items. On one occasion he informed the officers that he was hungry and they furnished him food. Otherwise, he made no complaint to the jailers who fed him or to the officers who talked with him that he was hungry or that the food was inadequate. Subsequent to October 6, he stated that he had been well-treated in this respect. There was no attempt by the police to weaken the prisoner by inadequate feeding.

5. The cell in which Davis was held was similar to the other cells in the jail, six by ten feet, equipped with a bed, mattress, drinking fountain, and commode. Ventilation was supplied by ceiling fans. Davis was permitted to use a shower bath located near his cell.

6. From September 21 through October 6, neither friend nor relative saw the applicant; however, he was not held incommunicado and he would have been permitted visitors had they come to the city jail and requested to see him. Davis' sole request for visitors was to see his sister, Eloise Stowe, who lived in Charlotte. The officers to whom he made this request contacted his sister and conveyed this message to her. He made no request for counsel.

7. The investigation into the death of Mrs. Cooper was conducted by the Detective Division of the Charlotte Police Department, under the supervision of Captain W. A. McCall. The Cooper case was specifically assigned to Detectives W. F. Hucks and Harold Fesperman. From September 21 through October 6, Detectives Hucks and Fesperman talked with Davis once or twice daily. The interviews were conducted in the detectives' interrogation room of the city jail during the daytime and were approximately one hour long. Davis was a suspect in the Cooper case from the time of his arrest because of the nature and location of the crime; however, the questions prior to October 3 were directed to his background, the sources of the articles in his possession at the time of arrest, and the thefts and unlawful entries which Davis told the officers he had committed after his escape in the vicinity of Asheville, North Carolina. During this period the officers attempted to verify his statements, and Davis was taken to Asheville and vicinity in order to identify the scenes of the crimes to which he professed. Detective Homer C. Gardner, who had known Davis previously, assisted Hucks and Fesperman in the interrogation of Davis on three occasions.

8. On October 2 Detectives Jack W. Porter and W. O. Holmeberg questioned Davis for a short period of time on two occasions concerning his abnormal sex habits. During the afternoon of October 3 Detectives Porter and Holmeberg asked Davis if he would like to go out for some fresh air. They took Davis in an automobile through the Elmwood Cemetery, the scene of the rape-murder, but failed to observe any reactions.

On the afternoon of October 3 the Cooper case was mentioned to Davis for the first time. Detectives Holmeberg and Porter asked Davis if he knew why he was incarcerated. Davis replied that he believed it was becasue of the death of Mrs. Cooper. He was then asked if he committed the crime and he denied it.

9. On October 5 Davis was interrogated concerning the Cooper case a

second time. Detective Hucks asked Davis what he knew about the murder and his whereabouts on September 20. He stated that he was in Belmont on that day. He again denied committing the crime.

10. On October 6, at about 12:30 p. m., Davis was questioned for the third time concerning the death of Mrs. Cooper. He was questioned by Detectives Hucks and Fesperman in the city jail in the office of Detective Lieutenant Sykes. Lieutenant Sykes, who had been on vacation during the period of Davis' confinement, came to his office during the questioning and requested that he be allowed to sit in. Sykes had known Davis' family and had talked with Davis some years before concerning other offenses. Davis was asked if he had anything to do with the murder and if he was in the cemetery on the day of the crime. He was asked where he had discarded his prison clothes and where he had obtained the clothing he was wearing and other items of personal property. Davis stated that he had discarded his prison clothes in the mountains when he escaped. He told the officers where he had obtained the clothing and other effects. He would not answer questions concerning the death of Mrs. Cooper. About 12:45 p. m. Lieutenant Sykes asked Davis if he would like to talk to any of the officers alone concerning the death of Mrs. Cooper. Davis stated that he would like to talk to Lieutenant Sykes. Hucks and Fesperman left the room. Sykes observed that Davis was holding a testament which had been distributed to prisoners by the local churches.

Thereupon, the following colloquy occurred:

Sykes: "Elmer, have you been reading the scriptures?"

Davis: "I have."

Sykes: "Since you have been here have you also talked with your Almighty?"

Davis: "I have not; I do not know how to pray. I wish you would pray for me."

Sykes then offered the following prayer:

"O God, You are now a witness to and the watcher over both of us. I have been asked to pray. I want You to be with me in this prayer. I want You to watch over the person that is present with me; also be with me. I do not only ask prayers for myself, I ask for You to be with all people."

After a short period of silence following the prayer, the colloquy continued:

Davis: "I'd like to tell you something."

Sykes: "All right."

Davis: "I killed that woman."

Sykes: "What woman, Elmer?"

Davis: "The woman in the cemetery."

Sykes: "Do you want to tell me about it?"

Davis: "Yes, sir."

11. Davis thereupon orally confessed to the rape-murder of Mrs. Cooper and related the details of the crime.[5] Davis then consented to accompany Sykes, Hucks, and Fesperman to the Elmwood

---

5. The oral confession, according to the testimony of Lieutenant Sykes, was as follows:

"He went ahead and related to me how he had gone to the cemetery. He told me how she was sitting on the bench; that he came up behind her and grabbed her and related how he carried her on beyond a large tombstone, and that he laid her on the ground, and that he believed in his opinion that her head had hit the corner of the tombstone; and that at that time he had unnatural relations with her; and that he picked her body up and carried her through a large hole that was in a fence that separated two sections of the cemetery, and carried her to a building and put her through a hole that was in the building and placed her on the floor inside; and that he left, and that she was bleeding when he left, but at the time he thought that she was still living." Transcript, p. 234.

Cemetery where he reenacted the crime.[6] Upon his return to the jail, Davis was asked by Chief of Police Jesse James whether he had been mistreated or if anything had been done to him that would cause him to make any statement against his own free will. Davis replied, "Chief, I have been treated all right." Davis then repeated his confession and the details of the crime in the presence of Captain McCall and Detectives Sykes, Hucks, Fesperman, Gardner, and Claude E. Davis, Jr., a police stenographer. The confession was typed and read to Davis. He affirmed the truth of the statements and signed the confession. Thereafter, he was taken to the Mecklenburg County Jail and formally charged with the murder of Mrs. Cooper.

12. From September 21 through October 6, Davis was neither beaten, threatened, nor cursed by the police. At the time of his written confession, he was advised of his right to remain silent and warned that any statement which he made could be used for or against him in a court of law, and he was informed of his right to counsel. The written confession also contained an admission that it was made freely and voluntarily.

13. On October 7 Dr. J. S. Nathaniel Tross, a member of the colored race and Davis' former pastor, came to see Davis after reading an account of the confession in a local newspaper. Dr. Tross conferred with Davis privately. Davis told him that he had not been mistreated in the city jail; that everyone was kind and courteous to him; that he was properly fed, and that his statements, written and oral, and his reenactment of the crime, were voluntarily made. Davis further stated that he was moved by the prayer of Lieutenant Sykes to make the statement concerning the death of Mrs. Cooper.

The foregoing account of the external events and circumstances surrounding the confession constitute the background against which it must be appraised.

 The test of the admissibility of a confession is whether "the confession is made freely, voluntarily and without compulsion or inducement of any sort." Wilson v. United States, 1896, 162 U.S. 613, 623, 16 S.Ct. 895, 899, 40 L.Ed. 1090. The question in each case is whether the will of the accused is so overborne at the time of the confession that his statement is not the product of a rational intellect and a free will. Reck v. Pate, 1961, 367 U.S. 433, 400, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948; Lynumn v. Illinois, 1963, 372 U.S. 528, 83 S.Ct. 917, 920, 9

6. Lieutenant Sykes described Davis' reenactment as follows:

"We proceeded under Elmer's directions to a spot in the cemetery. He informed us that that would be about as close as we could get in a car. We stopped the car under his direction, and he led us to a spot in the cemetery. He showed us a fence that he crossed over. The fence at that time had some shrubbery close to it and some small trees with limbs. He told us how he came over this fence. He showed us a cement bench that a lady was sitting on. He said she was an elderly lady and said, 'Her back was to me'; that she was reading a newspaper, and that he crept up behind her and grabbed her. And from the bench, with him leading us, he went possibly twenty-five or thirty feet * * * away and showed us a large tombstone. This tombstone possibly sat about four to five feet high and possibly three feet wide; and on the opposite side of that he told us that's where he dropped her on the ground, and that in his opinion her head struck the corner of this monument. He showed us in the position that her body was laying. He, himself, got on the ground and showed us after 'ripping or tearing', as he described it, a portion of her pants, he showed us the position that he placed his own self on the ground; and at that time the unnatural act taken place.

"He then led us to a large hole in the fence. I think this fence possibly stood about six feet high. The hole was in the center, and it was a good, large hole, and at the top of the fence there was barbed wire. He showed us how he went through the hole. * * * (H)e carried us to a little house that is called a mausoleum and told us that that is where he placed the body.

"After leaving there, he carried us to a piece of shrubbery * * * where he had thrown, I believe, her pocketbook * * * or other effects that belonged to her * * *." Transcript, pp. 235–236.

L.Ed.2d 922. This question is to be answered with complete disregard of the truth or falsity of the statement. Rogers v. Richmond, 1961, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760.

As was said in Haynes v. State of Washington, 1963, 373 U.S. 503, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513, "The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly * * * where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused."

■ The concept of "voluntariness" has a two-fold aspect—the internal state of mind of the accused, and its effect when tested by legal standards. In determining the issue of voluntariness, it becomes necessary, first, to recreate the mental state of the accused by inferences drawn from the historical facts in order to determine how he reacted to the events and occurrences surrounding the confession; and, second, to apply the proper legal standards to the particular mental state thus recreated in order to determine the legal significance of how the accused reacted.[7]

The historical facts found in this case disclose that Davis is not a youthful, inexperienced, mentally defective or impressionable defendant, but on the contrary is an adult of mature years who has been convicted of several serious felonies and has been in prison almost continuously for the past sixteen years. At the time of his arrest as an escapee he was currently serving a 17 to 25 years sentence for robbery and assault with intent to commit rape.

He had had extensive experience with police procedures and was accustomed to prison confinement. His arrest and imprisonment as an escapee did not result in sudden separation from family and friends. His status as an arrested escapee distinguishes him from the ordinary suspect confined for interrogation and investigation. He was provided the customary food and accommodation supplied other prisoners. Considering his inactivity during the sixteen-day period, it cannot be said that the food was inadequate to sustain him.

Although Davis was interrogated daily, the questioning was not prolonged nor was it conducted by relays of officers.[8] On the contrary, only five officers questioned him prior to October 6, and the Cooper case was not mentioned until October 3. On the day of the confession Davis had been questioned approximately 15 minutes when Lieutenant Sykes offered his prayer. The prayer resulted from Davis' request and not from preconceived design. It was a simple supplication and, although Davis stated he was moved by the prayer, it cannot be inferred under all the circumstances that the prayer acted upon his religious hopes and fears so that the confession was the product of phychological coercion.

It is a significant fact that, on the day following the confession, Davis told his former pastor during a private conference that he had been well-treated and that his confession was voluntary.

■ The Court concludes from the totality of circumstances in this case that the confession was the product of a rational intellect and a free will, and hence not involuntary or obtained in violation of due process.

The application for a writ of habeas corpus is hereby denied.

---

7. See the discussion in Part IV of the opinion of Justice Frankfurter in Culombe v. Connecticut, 1961, 367 U.S. 568, 603, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037.

8. Compare Turner v. Pennsylvania, 1949, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810.