Elmer DAVIS, Jr., Appellant,

v.

STATE OF NORTH CAROLINA, Appellee.

No. 9256.

United States Court of Appeals Fourth Circuit.

Argued April 29, 1964.

Decided Dec. 8, 1964.

Sobeloff, Chief Judge, and Bell, Circuit Judge, dissented.

W. B. Nivens and Charles V. Bell, Charlotte, N. C., for appellant.

James F. Bullock, Asst. Atty. Gen. of North Carolina (T. W. Bruton, Atty. Gen. of North Carolina, on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BELL, Circuit Judges. By consent, resubmitted before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and BELL, Circuit Judges, en banc, without additional argument.

HAYNSWORTH, Circuit Judge:

The case of Elmer Davis, Jr., convicted in North Carolina of rape-murder, is again before this Court. This time it comes on appeal from the denial of a writ of habeas corpus after a full evidentiary hearing in the District Court, and the resolution by that Court of the historical facts based upon evidence taken before the Court and the prior record in the state court. Since the Court's ultimate conclusion was warranted by its findings and the findings are supported by evidence, we affirm denial of the writ.

Elmer Davis, Jr., was tried and convicted in the Superior Court of Mecklenburg County, North Carolina of the rape-murder of an elderly woman, Mrs. Foy Bell Cooper. During the trial, a written confession was offered and received in evidence against him, as was testimony of his re-enactment of the crime, after the Court had heard evidence as to its voluntary character and had found the confession voluntary and admissible. The jury must also have found the confession voluntary, for it was told by the Court that reasonable doubt of guilt would follow from reasonable doubt that the confession was voluntary.

On appeal to the Supreme Court of North Carolina, the conviction was affirmed.[1] The Supreme Court of the United States denied a petition for a writ of certiorari.[2]

Thereafter, Davis filed a petition for a writ of habeas corpus in the District Court, which was denied after a hearing during which the District Court reviewed the state court record.[3] On appeal we reversed, a majority of the Court holding that the general finding in the state court that the confession was voluntary was not a resolution of the historical facts which the habeas corpus court could accept. We held that the parties should be afforded another opportunity to present directly to the District Court evidence bearing upon the question whether the confession was voluntary or the product of coercion.[4]

Pursuant to our mandate a full evidentiary hearing was held in the District Court, following which the District Judge made detailed findings of fact and concluded that the confession was voluntary.[5] From that conclusion, it follows

1. State v. Davis, 253 N.C. 86, 116 S.E.2d 365.

2. Davis v. North Carolina, 365 U.S. 855, 81 S.Ct. 816, 5 L.Ed.2d 819.

3. Davis v. North Carolina, E.D.N.C., 196 F.Supp. 488.

4. Davis v. State of North Carolina, 4 Cir., 310 F.2d 904.

5. Davis v. North Carolina, E.D.N.C., 221 F.Supp. 494.

that receipt in evidence of the confession by the state court was not an infringement of any constitutional right of the defendant.

Davis has again appealed.

The historical facts, as found by the District Court, may be briefly summarized here. The factual disputes underlying the ultimate issue are more fully detailed in the earlier opinions of this Court and in those of the District Court and of the Supreme Court of North Carolina.

Shortly before September 20, 1959, Davis escaped from a North Carolina prison camp. With a prior record of other offenses, he had been sentenced to seventeen to twenty-five years imprisonment upon his conviction of robbery and of assault with intent to commit rape. Those offenses had been committed within a few blocks of Elmwood Cemetery in Charlotte, North Carolina, where Mrs. Cooper was murdered on September 20, 1959 while being sexually attacked.

The day after the Cooper murder, Davis was arrested in Belmont, North Carolina, some twelve miles from Charlotte. He was not in his prison uniform, but was clad in civilian clothes. He had in his possession women's undergarments and a billfold containing identification papers of one Bishel Buren Hayes. Hayes later testified that, on September 20, 1959, the billfold and his shoes were removed from his person while he lay in a drunken sleep near the boundary of a railroad right-of-way and Elmwood Cemetery in Charlotte.

When Charlotte police officials learned of the arrest of Davis, they thought he might be a suspect in the Cooper murder. They thought so because of the fact that Davis had previously been convicted of a similar assault in the vicinity of Elmwood Cemetery. They requested and received permission of the warden of the state prison to lodge him in the Char-lotte City Jail and to keep him temporarily in their custody.

Davis was held in the Charlotte City Jail for sixteen days, except for a day and a night when he was held in Asheville and its vicinity. The District Court has found that during those sixteen days he was adequately fed and properly treated. He was not abused physically. He was not threatened or intimidated. He had access to a shower bath which he used. He was questioned from time to time, but not lengthily or overbearingly. Until the last few days, the questioning was about his possession of the articles he had with him when arrested and the clothing that he wore. He told the officers he had obtained them in the course of break-ins he had committed in the vicinity of Asheville, North Carolina, and the officers undertook to confirm his stories. They were unable to do so, even though on October 1–2 they finally took Davis with them into the mountains near Asheville, where he had promised that he would point out the scenes of his thefts. He was unable to identify them, and his reports of thefts in the mountains remained unverified.

On the afternoon of October 3, 1959, the Cooper case was mentioned to Davis for the first time. He denied knowledge of it. It was again mentioned to Davis on October 5 when he again denied complicity in the crime and stated that he had been in Belmont on September 20. On October 6 Davis was again questioned about the Cooper case. Davis expressed the wish to speak to one of the officers alone. He had known that officer earlier. When the two were alone, the officer referred to Davis's use of a Bible which he was carrying in his hand. Upon inquiry Davis told him that he had been reading the Bible, but had not been praying for he did not know how to pray. He agreed that he would like the officer to pray for him.[6] Thereupon, the officer offered the following prayer:

**6.** The District Court found that the request of prayer originated with Davis. The prayer internally and the testimony in the state court record support the finding, though the officer's testimony at the habeas corpus hearing indicates that it originated with him, that is, that he asked Davis if Davis would like for him

"O God, You are now a witness to and the watcher over both of us. I have been asked to pray. I want You to be with me in this prayer. I want You to watch over the person that is present with me; also be with me. I do not only ask prayers for myself, I ask for You to be with all people."

Following the officer's prayer, Davis told the officer of the attack upon Mrs. Cooper and the disposition of her body. Later, in the cemetery, he re-enacted the crime, pointing out the place where it had occurred, the opening in the fence through which he removed her body, and the place where he hid it. He also recovered his prison shoes in the bushes where he had concealed them near the cemetery. Still later, he repeated the entire confession before other officers and signed a typewritten version of it after it had been prepared.

In this Court, Davis attacks the denial of the writ primarily upon the basis of his version of the facts. He presents the case as if from the outset he had been questioned for long and exhausting periods by relays of officers about the Cooper murder, was beaten,[7] threatened, intimidated, furnished insufficient food and denied access to a shower bath. Davis, indeed, made such contentions, but they are now foreclosed by the findings of the District Court, which have abundant support in the record. Findings not clearly erroneous are binding upon us here and may not be disregarded as Davis would have us do.

Indeed, the evidentiary support of these findings is overwhelming, with the exception of that for the ultimate finding that his feeding was adequate, and the support of that finding is sufficient.

The Charlotte City Jail has no kitchen. From its own facilities it supplied its prisoners with such things as coffee, but it imported the solid foods for their sustenance. It routinely ordered from outside suppliers two sandwiches per meal per prisoner. Each prisoner was entitled to his two, and, since some wished only one, more than two were frequently available to those prisoners whose appetites were so great. The routine fare was cold, and on one occasion Davis expressed a wish for hot hamburgers instead of cold sandwiches. Two hot hamburgers and a glass of milk were procured for him. When he went with the officers to Asheville to show them the scenes of his claimed thefts, he had two hot meals, one in the home of one of the officers. Davis, himself, testified that when he requested such things as peanuts and cigarettes they were supplied. There was testimony that his requests for peanuts, soft drinks and similar food were rewarded not because of any indication of particular hunger, but out of suggestion of particular taste.

■ This evidence adequately supports the finding that the confession was not the product of hunger. The meals that Davis had in and out of the Charlotte City Jail were not so deficient as to require a finding that denial of an unexpressed wish for the prison fare of the county jail was coercive.

While the prisoner's principal attack is in disregard of the well-supported findings of fact, there are questions which lurk in the case which require our consideration.

A question arises out of the fact that his arrest sheet in the Charlotte City Jail bore a notation that he was not to be allowed to use the telephone, and

to pray after Davis had told him that Davis did not know how. Whether or not the suggestion originated with Davis, however, it is perfectly clear that he assented.

7. There were a number of variations in his testimony in the habeas corpus court as

contrasted with his testimony in the state court. In the habeas corpus court, for instance, he testified he was slapped and "smacked," but his testimony in the state court, though covering in detail other contentions he makes, contains no such claim.

that no one was to be allowed to see him. Using that as a very substantial launching platform, Davis contends that he was held incommunicado and that attempts to contact counsel through his sister were frustrated by the police.

The District Judge found as a fact, however, that the notation on the arrest sheet was disregarded, and this finding has evidentiary support. During his confinement in Charlotte, Davis sought to see no one other than a sister, whom he had not seen for some twelve years. He did seek to contact her, and one of the officers assisted him when he encountered difficulty in locating her in the telephone directory. Even with that assistance, however, he was unable to ascertain her telephone number, so the officers, themselves, went in search of the sister. They found her and told her that her brother was in the jail and wished her to come to see him. She responded that she would go to see him when she could, but she could not then leave her children.

The sister testified in the habeas corpus hearing that she twice went to see her brother in the Charlotte City Jail, but each time was turned away. The District Judge did not believe her, finding, as the officers testified, that neither she nor anyone else was turned away. Their testimony is the more readily believable in light of the fact that one of them had undertaken to assist the prisoner in his efforts to contact the sister by telephone, and, that failing, others personally conveyed his message to her. Surely they would not have gone to such length to convey to the sister the request that she go to see her brother if they intended to deny her access to him.

There was also testimony that Davis had been informed by the police officers of his right to counsel.[8] Davis made no request for legal assistance. Indeed, even after seeing his sister, he let three months go by before undertaking to contact an attorney.

This case is, therefore, far from the principal of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. In Escobedo, a suspect, not otherwise lawfully subject to detention, was being interrogated. During the course of his questioning he repeatedly asked permission to consult his lawyer, and his lawyer was present in police headquarters, insistently demanding access to his client. One time, through opening doors, the lawyer and client actually got a glimpse of each other, but their persistent demands and requests to consult were as persistently refused until after a confession had been obtained. The Supreme Court held, of course, that the suspect should have been allowed to speak to his lawyer who was present for that purpose and who was actively asking, himself, to speak to his client. Denial of the right to consult his attorney was held, under those circumstances, to have been a denial of due process.

Here, we have no such circumstances. Davis, advised that he could consult an attorney if he wished, sought only to have his sister come to see him. The police did all that they could to assist him in the realization of that wish. When there was no request of legal assistance and when the police did all that reasonably might be expected of them to facilitate the prisoner's seeing the one person he wished to see, it cannot be held that the police unreasonably deprived him of his right to counsel.

The notation on the arrest record creates suspicions in one's mind, but such suspicions cannot overcome the positive evidence that the notation had no practical effect or influence upon what was done and that help rather than hindrance was offered to him in his one effort to contact someone outside the prison walls. The District Court's acceptance of such testimony and its findings based upon

8. They also informed him of other rights, such as his right to remain silent, so the

officers testified and the District Court found.

it make the principal of Escobedo completely irrelevant to this case. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513, is equally inapposite.

■ If the prayer which was said before Davis unburdened himself with the details of his crime was not so innocuous, it would give us concern. Whether, however, the idea of the prayer originated with Davis or with the officer, it was so bland that it cannot be said to have been coercive.

Religious influence and religious exhortation preceding a confession have been thought not only unobjectionable but indicative of the trustworthiness of the confession. Wigmore emphatically declares that since a contrary suggestion in an English case of 1823, religious exhortations have never "been regarded as vitiating a confession." [9]

There is an interesting note written by a clergyman-law student in 1 Washburn Law Journal 415 on the role of the clergyman in the coerced confession. The author of that note agrees with Wigmore that the cases have not held confessions to be the product of intimidation though extracted by a clergyman's invocation of the terrors of an eternal Hell if the Lord's forgiveness is not sought and obtained on the basis of a complete confession. The author thinks that such confessions should be recognized as having been coerced, and, perhaps, they may be now that it is recognized that coerced confessions are to be

excluded from evidence however trustworthy they may appear to be.[10]

Here, however, the police officer was not the prisoner's religious or spiritual adviser, and the little prayer invoking God's blessing upon the two of them contained no hint of Divine punishment or suggestion of the cleansing power of confession. Davis appreciated the prayer, and the next day he told Dr. J. S. Nathaniel Tross, a Negro minister who had served a congregation of which Davis and his family had formerly been members, that he had been moved by the prayer to make the confession. At the same time he told Dr. Tross, however, that he had been treated well and with kindness, that he had been properly fed and not mistreated in any way, and that the statement he had made was entirely voluntary. He seems to have been saying that the statement was the product of kindness and considerate treatment, of which the prayer was an outstanding example.

While the prayer may have moved him to speak, we cannot say, in disregard of the District Court's findings, that it overcame his will. If prayer or other religious influences are to be held coercive so as to require the exclusion of a subsequent confession, the religious references, themselves, ought to be designed or calculated to so arouse the prisoner's fears of a divine judgment as to overcome his resistance to present confession. The prayer here was not so designed, and nothing in it can be said to be reasonably calculated to have that result.[11]

9. 3 Wigmore on Evidence, 3d ed. 1940 § 840.

10. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760.

11. The author of the note in the Washburn Law Journal, mentioned above, suggests only that religious exhortations by clergymen should be suspect and then only when the clergyman's apparent purpose is the production of a confession, even though the clergyman may sincerely believe that a confession is essential to Divine forgiveness and ultimate salvation of the prisoner's soul. When there has been a prior relationship between the clergyman and the prisoner, justifying the conclusion that the prisoner looks upon the clergyman as his spirtual adviser, such religious exhortations may be all the more coercive. Here, of course, there was nothing to indicate that Davis looked upon the policeman as his spiritual adviser, and there is nothing else to indicate that the bland little prayer was calculated to break down his resistance. The very fact that he asked to be allowed to talk to that officer alone indi-

The contention which Davis advances that his detention became illegal when he was not earlier charged with the Cooper murder is quite unfounded.

██ Unreasonable delay in the arraignment of a federal prisoner charged with a federal crime is prohibited.[12] The genesis of the prohibition was not in the Constitution, however, but in the supervisory power of the Supreme Court over the administration of justice in the federal courts. This, the Court made plain when it announced the rule in McNabb, and subsequently demonstrated in holding that the McNabb rule is inapplicable to criminal prosecutions in the state courts.[13] The due process clause of the Fourteenth Amendment prohibits a state's use of a coerced confession, but when the habeas corpus court considers a state court conviction, unreasonable delay in arraignment does not provide a mechanical answer. Such unreasonable delay is only one circumstance which, with all others, ought to be considered in arriving at an ultimate finding as to whether or not the confession was voluntary.

██ Davis's case is not helped by the fact that North Carolina law also requires arraignment of state prisoners without unreasonable delay. If that requirement of state law was violated, it might give rise to state remedies, but it does not constitute a basis for habeas corpus relief in the federal courts.[14] The Fourteenth Amendment imposes minimal standards for state criminal procedures. It does not prohibit a state from adopting more protective procedures and, when one does, strict compliance with the more fulsome state-created right does not become a matter of federal right or subject to protection in the federal courts.

More importantly, there was here no unreasonable delay in the arraignment. There was no violation of the state requirement or of the spirit of the McNabb rule.

██ Davis was not taken into custody because he was suspected of having murdered Mrs. Cooper. He was arrested by the Belmont police because he was an escaped convict. Thereafter he was at all times held by the authorities under the judgment of conviction for assault upon which he was being held at the time of his escape. The immediate custody of the Charlotte police, with permission of the State Warden, was, in law, that of the Warden.[15] Clearly, Davis was not entitled to bail or to be released upon any terms or under any circumstances. His detention, therefore, during the investigation of the Cooper case was entirely lawful.

██ This has been clearly held in a number of cases.[16] A convicted felon lawfully detained under a valid judgment is not immune from investigation of other crimes, and, when he becomes suspected of possible implication in other

cates a pre-existing personal confidence, but not a religious one, and a readiness to confide in that one officer things he had been unwilling to tell others.

The circumstances here are in strong contrast to the calculated use of religious doctrines to extract a confession disclosed in the cases discussed in the Washburn Law Journal note and suggested in the opinion of the Supreme Court in United States v. Carignan, 342 U.S. 36, 40, 72 S.Ct. 97, 96 L.Ed. 48. The Carignan opinion, at least, leaves open the possibility that aggravated use of religious influence for the purpose of extracting a confession may be held to be coercive; it does not suggest that in this unaggravated situation, this Court may disregard the District Court's finding that the prayer was not coercive.

12. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

13. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469; Gallegos v. Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86.

14. Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481.

15. Tyler v. United States, 90 U.S.App.D.C. 2, 193 F.2d 24.

16. United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97; Rademacher v. United States, 5 Cir., 285 F.2d 100; Pependrea v. United States, 9 Cir., 275 F.2d 325.

crimes than those for which he has already been convicted, he does not become entitled to release. No rule of law forecloses reasonable interrogation of such a prisoner, though the interrogation is concerned with other possible crimes, so long as the interrogation, itself, is not so unreasonably pursued as to become coercive.

■ Here, the police officers had no probable cause to charge Davis with the murder of Mrs. Cooper until he confessed it. Neither the spirit of the McNabb rule nor the North Carolina law requires that he be charged with a crime without probable cause to support the charge. When they had probable cause to charge him with the murder of Mrs. Cooper, they did so. Under either rule, the beginning of the running of the time for arraignment could not be earlier than the discovery of probable cause for preferring the charge. When the prisoner is lawfully detained under some other charge, or, as here, under a previous conviction, his confinement is not made unlawful because he is suspected of having committed another crime under prolonged investigation.

■ Finally, it may be suggested that Davis should have been delivered promptly by the Charlotte police into the immediate custody of the State Warden, where he could mingle with a large, general prison population and where he would be not so readily available to detectives investigating the Cooper murder. The convicted prisoner, however, has no right to determine the place or the circumstances of his confinement or to complain that arrangements for his custody are made with regard for the convenience of officers investigating other crimes. So long as the circumstances of his actual confinement cannot be said to have been coercive, and they reasonably have been found not to have been so here, they do not become coercive because someone may now think the prisoner would have been happier, or

less likely to have confessed, had he been placed in the general population of a large prison at some other location.

There have been isolated attacks upon the legality of custody by officers investigating some other crime than the one upon which the prisoner was then lawfully held in confinement, but they have been unavailing. Thus, where a prisoner, lawfully held after arraignment upon charges of robbery and assault, was delivered into the custody of detectives investigating a murder, his custody by the detectives was held to be lawful.[17] Another prisoner who had been confined in the federal penitentiary at Danbury, Connecticut, was transferred under a writ of habeas corpus ad testificandum to the House of Detention in New York, where he, subsequently, confessed the commission of another crime. He attacked his confession, claiming, among other things, "that detention in the New York House of Detention was much more unpleasant than in Danbury," but that circumstance did not vitiate the confession.[18]

Prisoners may, and undoubtedly do, have preferences between prisons and other penal institutions. The fact that one would have preferred to have been confined elsewhere, however, has not yet been held to have been a basis of exclusion of a confession made by him of his complicity in some other crime. The circumstances of his actual confinement at the time of his confession and during the preceding period of interrogation and investigation are highly relevant, of course, but, if they are not in themselves coercive and the confession is otherwise voluntary, there is no basis for the application of an exclusionary rule.

■ Here, as we noted at the outset, the District Judge has found that the confession by Davis of the Cooper murder was voluntary. His ultimate finding is supported by subsidiary findings, and they, in turn, are quite adequately supported both by the evidence

17. Tyler v. United States, 90 U.S.App.D. C. 2, 193 F.2d 24.

18. United States v. Gottfried, 2 Cir., 165 F.2d 360.

taken before him in the habeas corpus hearing and by the evidence taken in the state trial which resulted in the murder conviction. Upon the basis of those findings, the District Court quite properly concluded there was no constitutional infirmity in the state trial and the conviction was not in violation of any constitutional right.

We conclude that the District Judge properly denied the writ.

 There remains a moral question as to whether one of Davis's mentality should be executed or whether his sentence should be commuted to life imprisonment. That is a matter of executive clemency, and the courts are powerless to prescribe the answer. The possibility of any such relief can be explored only with North Carolina's Governor.

Affirmed.

SOBELOFF, Chief Judge, with whom BELL, Circuit Judge, joins (dissenting).

Perhaps the most recalcitrant problem to engage the attention of courts in the area of law enforcement stems from the inveterate police practice of pressing for confessions behind closed doors where the accused is without access to legal guidance. That such inquisitions involve elements of coercion has long been recognized. Correction has been impeded by the inherent difficulty of ascertaining the truth between the possibly false or exaggerated claims of the accused and the customary unanimous denials of the police who in the circumstances can be the only witnesses.

In recent years courts have come to realize with ever increasing clarity that the practice often presents more than debatable issues of coercion. It is now established on the highest authority that "when the process has shifted from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession," the accused must be permitted to consult with a lawyer. This is the requirement of the Sixth Amendment to the Constitution of the United States as made obligatory upon the states by the Fourteenth. Escobedo v. Illinois, 378 U.S. 478, 492, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

I.

As the majority opinion recites, when Davis, a prison escapee, was arrested in Belmont, North Carolina, on September 21, 1959, the Charlotte police "received permission of the warden of the state prison to lodge him in the Charlotte City Jail and to keep him temporarily in their custody." The opinion also states, correctly, that the Charlotte police sought the custody of Davis because "they thought he might be a suspect in the Cooper murder [case]."

From the outset, the authorities did not put him in the jail customarily used for lengthy detention of persons awaiting trial, where suitable kitchen, bathing and other facilities are afforded, but lodged him in a lockup in Detective Headquarters across the street, which is habitually used for brief, overnight detentions only. Unusual too, and highly indicative of the purpose of the police in pursuing this course, is the specific notation made on the arrest sheet: "Do not allow anyone to see Davis, or allow him to use telephone."

Some of the ensuing events are in dispute, but others are incontestable. Certain it is that not until the defendant had remained in solitary confinement for 16 days did he confess. The testimony is in conflict as to details, such as the extent and continuity of the questioning, the claims of threats, beatings, scantiness of food, etc. Such contradictions are inevitable. In many cases the fact finder may stifle his doubts by adopting a merely quantitative measure in appraising the testimony. He may accept the denials of the police who outnumbered the lone accused in the station house and on the witness stand, and may reject the prisoner's claims. Yet because of the very nature of the dispute the fact finder cannot be quite sure.

In the present case, however, certain powerful objective facts remain untouched even by the sweeping denials of the officers. First is their plainly manifested purpose, indeed avowed by them on the arrest sheet, to enforce absolute and uninterrupted seclusion during the interrogation. This ineluctable piece of evidence remains undenied and undeniable. It dominates the record and challenges the police version more eloquently and more conclusively than any oral testimony. The instruction not to permit anyone access to Davis and not to allow him to communicate with the outside world can mean only that it was the determination of his custodians to keep him under absolute control where they could subject him to questioning at will in the manner and to the extent they saw fit, until he would confess. To achieve their goal they made sure that he would not have the means of asserting his constitutional right to consult counsel and of exercising his constitutional right not to incriminate himself. The circumstances were at best calculated to weaken his will and to permit the prisoner no support from counsel or friend. The historic fact is that he did not break until the sixteenth day of confinement. Only after he had confessed was the isolation terminated.

Rarely do police officials make a written declaration, as they did here, of a design to deny their prisoner's right to counsel and his other constitutional rights.[1] This undisputed fact is sufficient to invalidate the confession irrespective of the District Court's resolution of any disputed issues of fact.

We turn first to the violation of the right to counsel as ground for the exclusion of the resulting confession.

## II.

On the uncontroverted facts, the principle of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758 (1964), is applicable. In that case, the Supreme Court formulated its holding in two separate statements. The first was:

"[W]here, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335], at 342 [83 S.Ct. 792, at 795, 9 L.Ed.2d 799], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." The Court says in summation:

"We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

Thus Escobedo announced no new constitutional right, but indicated circum-

---

1. When it came to the attention of the Supreme Court, it sharply criticized a practice substantially identical to the one here in question. Haynes v. Washington, 373 U.S. 503, 505, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). There, Haynes admitted participation in a recently committed robbery. Instead of charging him with the crime, the police booked him for "investigation" and placed him on the "small book." Prisoners so booked were not permitted to make phone calls or have any visitors. The Court condemned this practice.

stances in which the right to counsel previously announced in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792 (1963), would be available.

The Supreme Court's holding in Escobedo was explicitly based upon its earlier teachings in Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961); White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), that under the Constitution a state criminal defendant is entitled to the "guiding hand of counsel" when a critical stage in the proceedings has been reached. The doctrinal importance of Escobedo is found in its recognition that the interrogation of a suspect in police custody is a critical juncture in the criminal process, and that the inquisition may not be persisted in without according him the right to counsel. Otherwise, the real trial occurs in the police station, and the trial in court is:

> "no more than an appeal from the interrogation; and the 'right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination.' In re Groban, 352 U.S. 330, 344 [77 S.Ct. 510, 519, 1 L.Ed.2d 376] (Black, J., dissenting)" quoted in Escobedo, 378 U.S. at pp. 487–488, 84 S.Ct. at p. 1763.

Today's opinion would limit Escobedo to its precise facts and in so doing loses sight of the basic doctrine of that case.

The majority would codify into a rigid formula the particularities of Escobedo, namely, that a lawyer has been previously employed, is present in the station house, peers through a glass door and makes futile efforts to signal his client who is then being spirited out of sight. It is inconceivable that the Court meant to make the Escobedo doctrine available only in cases with features which are its exact carbon copy. It is true that the Court used the qualifying phrase "under the circumstances here." This should not be read as the equivalent of *"only under the circumstances here."*

It is as illogical to exclude from the operation of the Escobedo doctrine all but the very circumstances of that case, disregarding cases presenting analogous circumstances, as it would be to embrace within its doctrine, indiscriminately, all cases irrespective of circumstances. We have here no borderline case where the police may fairly claim some latitude in questioning a person whose status is still obscure. Davis was definitely the suspect when he was arrested and sealed off in the special lockup. From then on the officers' concentrated effort was to draw out of his own mouth words that would perfect the case against him. Apart from any physical mistreatment or threats, which are charged but denied, questioning him and keeping him out of the way of any possible help from lawyer or friend from September 21 to October 6 was a bald violation of his rights.

Nor is there any force in the argument that Davis, according to the credited testimony of the police, did not ask for a lawyer. It has been adjudicated that the failure to demand counsel at other critical points works no forfeiture of the right. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199 (1964); White v. Maryland, 373 U.S. 59 (1963); Carnley v. Cochran, 369 U.S. 506, 513, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157 (1961). Neither should the right be lost for failure to assert it when the accused is subjected to interrogations in the police station. Escobedo does not make it necessary under all circumstances for the person in custody to ask to see a lawyer. It happens that Escobedo did make such a request. The District Judge here has accepted testimony of the police that Davis did not specifically request counsel. For present purposes it is unnecessary to challenge the finding.

Moreover, when police have gone to the length of giving written instructions that the prisoner is not to be allowed to be seen by anyone or to use the telephone, it is fantastic to insist that he should have formally requested a lawyer. Much good it would have done him! Since the order had been issued to deny Davis all contact with the outside, it would be naive to think that the police behaved toward him in such a way as to leave him under the impression that a request for counsel would be honored.

But the finding as to whether or not Davis did in fact make such a request is unimportant. The point was underscored by the California Supreme Court in People v. Dorado, 40 Cal.Rptr. 264, 394 P.2d 952, which held applicable the rule announced in Escobedo, irrespective of whether or not the defendant has actually requested counsel.

> "We find no strength in an artificial requirement that a defendant must specifically request counsel; the test must be a substantive one: whether or not the point of necessary protection for guidance of counsel has been reached. * * * We should not penalize the defendant who, not understanding his legal rights, does not make the formal request and by such failure demonstrates his helplessness." [2]

It is also true that Escobedo had employed a lawyer who was not permitted to speak to him during the police interrogation. Davis had no lawyer and the police made sure that he should have none while they worked to get his confession. The factual distinctions between the two cases seem immaterial.

Indeed, in their totality, the circumstances here are more aggravated than in Escobedo.

It was found by the District Court, in accordance with the police testimony, that at the time of the *written* confession the defendant was advised of his right to remain silent and warned that the statement which he was asked to sign could be used "for or against" him in a court of law and that he was informed of his right to counsel. Accepting the finding, one may ask, of what earthly use was it, having kept this man incommunicado for 16 days until after he had made an oral confession, to tell him only then of his constitutional right to maintain silence? At that stage the police were merely going through the mechanics of getting evidence in writing of the previously obtained oral confession. Cautioning the prisoner then was utterly ineffective and can import validity to neither the oral nor the written confessions. The court should disregard this hollow gesture designed to legitimate the illegal proceedings.

Because the Supreme Court's decision in Escobedo came after Davis' state trial and after the District Court's habeas corpus hearing, a question may be raised as to its retroactive application.[3] But Escobedo is merely a particularization of the right to counsel declared in Gideon. While the Supreme Court has not yet expressly declared Gideon to be retroactive, in Escobedo itself, it so applied the Gideon rule. Other federal and state courts have held Gideon to be retroactive.[4] Since Gideon has been given retroactive application so should Escobedo.

2. A trial judge of the New York Supreme Court, Queens County, has held Escobedo to be applicable only where the prisoner has requested and been denied the assistance of counsel. People v. Agar, 253 N.Y.S.2d 761 (1964).

3. See Meador, Habeas Corpus and the "Retroactivity" Illusion, 50 Va.L.Rev. 1115 (1964), who suggests that because the writ of habeas corpus tests whether the petitioner is presently detained in violation of the Constitution, there is no issue of retroactivity, and the habeas court must apply the Constitution as presently construed. The legality of the detention in the past, he suggests, is not, therefore, the determinative consideration.

4. United States ex rel. Durocher v. La Vallee, 330 F.2d 303 (2d Cir. 1964), cert. denied, 377 U.S. 998, 84 S.Ct. 1921, 12 L.Ed.2d 1048 (1964); Palumbo v.

For all of these reasons, and upon the very findings of the District Court, Davis' confession should have been rejected as having been obtained in violation of his right to counsel. Any use of the confession was prohibited irrespective of questions of voluntariness, and its admission into evidence requires reversal. However, because the record also shows that the confession was the product of the persistent coercive efforts of the police to obtain an acknowledgment of guilt, there is an additional reason for its exclusion. This further reason will be considered next.

### III.

In dealing with the issue of voluntariness of the confession, the court entertains too narrow a concept of the scope of appellate review. It accepts as virtually unreviewable findings of fact what in reality are erroneous conclusion of law. Also it too readily defers to findings that are clearly erroneous. Closer scrutiny discloses that some of the findings are without sufficient evidentiary support, being refuted by undisputed facts which the lower court has either overlooked or failed to accord proper weight. If this court were to analyze the findings and recognize their true nature, it could not hold the confession voluntary.

With all respect for the District Court, the conclusion is inescapable that in this instance it has failed in its task of fact finding and has not applied the correct legal standard. It is true that the police version of events surrounding the detention contrasts with Davis' account. But here, the District Court, in upholding the police version, has either ignored or rejected uncontroverted evidence indicating the coerciveness of the circumstances of Davis' detention. Surprisingly, for example, its opinion makes no reference whatever to the uncontroverted fact of greatest significance—the tell-tale notation on the police blotter, which directs that Davis be held incommunicado. When a finding rests upon testimony that is made utterly unworthy of credit by a predominant undisputed fact in the record, it is the duty of an appellate court to declare the finding clearly erroneous.

In relation to the place of detention chosen by the police, it is uncontradicted that the Charlotte city jail, where Davis was held, was an "overnight" jail, with extremely limited facilities. Highly suspect is the choice of this jail instead of the Mecklenburg County Jail, used for prisoners whose detention is to extend beyond a day or so. Coupling this with the admitted fact that from the time of Davis' arrest he was a suspect in the Cooper murder, it is too plain for doubt that the unusual place and duration of the detention and the strict secrecy were decided upon precisely because this best fitted the officers' plan to persist until they could draw a confession from the prisoner. Indeed, what other reason was there for not returning the defendant to the prison from which he had escaped, or putting him in the Mecklenburg County Jail?

The District Court found that the police, at Davis' request, had contacted his sister and it also rejected the sister's testimony that she had been turned away from the police station on two occasions when she asked to see Davis. The court was free to treat each of these pieces of testimony as worthy or not worthy of belief. However, the objective fact that neither the sister nor anyone else saw Davis until after the confession is unchallenged. This uncontradicted fact, when considered in conjunction with the explicit directions on the police blotter, demonstrates the error of the District Court's conclusion that Davis was not held incommunicado. If this does not constitute holding a man incommunicado, the word is meaningless.

State of New Jersey, 334 F.2d 524 (3d Cir. 1964); and in this Circuit see Jones v. Cunningham, 319 F.2d 1, 4 .(1963) (concurring opinion). The Michigan and Pennsylvania Supreme Courts have so held in In re Palmer, 371 Mich. 656, 124 N.W.2d 773 (1963), and McCray v. Rundle, 415 Pa. 65, 202 A.2d 303 (1964).

At the habeas corpus hearing the police admitted conducting daily interrogations of Davis. They claimed, however, that in the first 12 days their questions concerned thefts and unlawful entries committed by him after his escape, and that they did not ask him about the Cooper murder till October 3. This is palpable camouflage. It is not humanly possible that, notwithstanding their extraordinary arrangements, including seclusion of their subject in the special lockup, they refrained for almost two weeks from asking him about the Cooper murder, but confined their questions to some petty thefts. This is what the police ask the court to believe, despite their testimony that the Cooper murder was the reason they sought the consent of the Director of Prisons to hold Davis. Their version is that they interrogated him on October 3, after they had taken him to the cemetery, the scene of the murder. Even if the police testimony on this point is accepted, the questioning on the last four days is not to be considered in isolation, for the constant interrogation on the preceding 12 days doubtless had a cumulative effect, and its clear purpose was to break the prisoner's alibi in the murder case and not primarily to solve the minor offenses. According to the police themselves, the commission of the murder was consistently denied by Davis. At noon on October 6, after persistent earlier denials of guilt, he refused to answer questions concerning the death of Mrs. Cooper. But the questioning continued.

Thereupon a remarkable scene was enacted. A police lieutenant knelt in prayer with Davis. Whether it happened upon Davis' initiative, as the District Court found, or at the officer's instigation, as he plainly testified at the habeas corpus hearing (see n. 6, majority opinion), is not important.

If, as the court acknowledges, a clergyman's religious exhortations are suspect when the apparent purpose is to produce a confession,[5] how gravely questionable, for a somewhat different reason, must be the psuedo religious ministrations of a policeman. Particularly is this so when he appears on the scene at the instance of the team of inquisitors that has engaged in repeated efforts to "break" the prisoner and his sole purpose is to clinch the case against the man in his custody.

Police solicitude for the defendant's spiritual welfare would be less suspect if the police, so eager to provide religious comfort to a man who "did not know how to pray," had sent for a minister then, instead of having a policeman play the role of minister. It is noteworthy that although the police lieutenant substituted for a minister in the preconfession prayer, the police had ready access to a minister *after* the confession, who visited the accused and obligingly returned with a purported endorsement from Davis of the "good treatment" accorded him at Headquarters.[6]

The spectacle evoked by this record of the police officer and his prisoner uniting in prayer challenges the ingenuousness of the entire process. We are told that after a short prayer was pronounced, followed by a period of silence, Davis admitted that he had killed the woman in the cemetery. Thus the officer's prayer, at least, was answered.

As the Attorney General of North Carolina would have it, nothing that the police had done in 16 days influenced the confession. A "bland," almost banal little prayer, recited by the lieutenant and his quarry worked a miracle of repentance and confession. Far more reasonable is the conclusion that the confession came in response to the pragmatic appeal

5. See Kruse, The Role of the Clergyman in the Coerced Confession, 1 Washburn L.J. 414 (1961).

6. The minister admitted on cross-examination that for many years he had "co-operated" with the police, that he had visited many prisoners, and on several occasions later gave testimony about his conversations with them.

addressed to Davis in his predicament by Lieutenant Sykes: "Davis, go in there and sign that paper so that you can get something to eat and get a hot bath." It requires no profound insight to understand that before the prayer incident occurred the long isolation and secret interrogation without the benefit of counsel had insidiously worked its destructive effect. The prayer was injected into evidence by the state to divert attention from the legally vulnerable process that really led to the confession. This was an attempt to present a plausible alternative cause in explanation of the confession.

In no case on record has a confession been upheld where the prisoner was accorded similar treatment over so protracted a period. The decided cases involved at most incommunicado detentions for a few hours or a few days.[7] The confession in the present case was not a voluntary act, born of free will. It was the product of the massed efforts of some seven policemen against a single individual, constituting unlawful inducement and coercion. Haynes v. Washington, 373 U.S. 503, 519, 83 S.Ct. 1336 (1963). This is far from announcing an absolute rule forbidding all questioning of suspects. It is enough to say here that keeping a person in a police lockup for more than two weeks without opportunity to get advice or help, for the purpose of questioning him, is fundamentally unfair. A confession obtained under such conditions may not be used against him.

Davis' conviction was predicated upon the use of a confession obtained in breach of his constitutional rights in two respects—he was denied his right to counsel, and was subjected to a set of circumstances which were, in their totality, coercive. The conviction should not be permitted to stand.

---

7. The undisputed length of detention exceeds that in Turner v. Commonwealth of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949) (four nights and five days); or Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) (five nights and five days); or Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (three nights and four days); or Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed. 2d 1037 (1961) (four nights and five days); or Haynes v. Washington, 373. U.S. 503, 83 S.Ct. 1336 (1963) (sixteen hours).